# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                      )
**KEVIN BOTELHO,**                    )
                                      )
          **Plaintiff,**   )    **Civil Action No.**
                                      )    **15-11916-FDS**
          v.                )
                                      )
**NORDIC FISHERIES, INC.,**           )
                                      )
          **Defendant.**   )
_____)

## OMNIBUS MEMORANDUM AND ORDER
## ON BOTH PARTIES' DAUBERT MOTIONS

**SAYLOR, J.**

    This action arises out of an injury suffered by a seaman aboard a fishing vessel. Plaintiff Kevin Botelho was working on the F/V AMBITION, owned by defendant Nordic Fisheries, Inc., when he fell and injured his head. The complaint assets claims for negligence, unseaworthiness, maintenance and cure, and intentional and/or negligent failure to provide maintenance and cure. The principal factual dispute concerns whether Botelho slipped on the metal deck of the vessel or whether he slipped because he stepped on a skate fish.

    Defendant has filed three motions seeking to exclude the entire testimony of three of plaintiff's experts at trial. Plaintiff has filed two more limited motions seeking to preclude certain portions of the defendant's experts' testimony. For the reasons given below, defendant's motions will be denied; plaintiff's motion to exclude a portion of one opinion will be granted; and plaintiff's motion to exclude the findings of the IFISH Conference will be granted in part and denied in part.

## I. Background

Plaintiff filed the complaint in this action on May 26, 2015. The complaint alleges (1) negligence under the Jones Act, 46 U.S.C. § 30104 *et seq.*; (2) unseaworthiness under general maritime law; (3) maintenance and cure in the amount of $200,000, together with costs and interest; and (4) intentional and/or negligent failure to provide maintenance and cure. (Compl. ¶¶ 15-29).

In anticipation of trial, the parties have filed motions in limine to exclude certain expert testimony. Five motions are presently pending:

- Defendant's Motion to Exclude the Testimony of Plaintiff's Expert, Mr. Christopher D. Barry, P.E. and/or for Leave to Conduct His Deposition before Trial;

- Defendant's Motion to Exclude the Testimony of Plaintiff's Expert, Mr. William H. Burke, Ph.D.;

- Defendant's Motion to Exclude the Testimony of Plaintiff's Expert, Neal McGrath, Ph.D. and/or for Leave to Conduct His Deposition before Trial;

- Plaintiff's Motion Pursuant to F.R.E. 702 to Preclude Defendant from Introducing at Trial Simon Bellemare's Opinion # 3; and

- Plaintiff's Motion in Limine to Exclude Expert Opinions Relating to Claimed "Findings of the IFISH Conference."

The Court will consider each motion in turn.

## II. Standard of Review

Federal Rule of Evidence 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The adoption of Rule 702 in its present form codified the standard of admissibility for expert testimony that was set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

Under Rule 702, district courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597). That gatekeeping function requires that the court consider three sets of issues: (1) whether the proposed expert is qualified by "knowledge, skill, experience, training or education"; (2) whether the subject matter of the proposed testimony properly concerns "scientific, technical, or other specialized knowledge"; and (3) "whether the testimony [will be] helpful to the trier of fact, *i.e.*, whether it rests on a reliable foundation and is relevant to the facts of the case." *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1997) (quoting Fed. R. Evid. 702) (internal quotation marks omitted).

The requirement that an expert's testimony must be based on a reliable scientific foundation is often the "central focus of a *Daubert* inquiry." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). In *Daubert*, the Supreme Court enumerated a non-exhaustive list of factors that a court may consider in undertaking its reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *see also Samaan*, 670 F.3d at 31-32.

Less centrally, but importantly, Rule 702 requires the court to examine whether those methods have been reliably applied. In other words, the court must "ensure that there is an adequate fit between the expert's methods and his conclusions." *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591).

In evaluating whether expert testimony will be helpful to the trier of fact, the court must determine whether it is relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d at 81 (citations omitted); *see also Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000) ("The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue.").

The focus of the Rule 702 inquiry is on the principles and methodology employed by the expert, not the ultimate conclusions. *Daubert*, 509 U.S. at 595. The court may not subvert the role of the fact-finder in assessing credibility or in weighing conflicting expert opinions. Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596; *see also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony notwithstanding a lack of peer-reviewed publications because the opinion rested upon good grounds generally and should be tested by the "adversary process").

Expert scientific testimony that is admissible under Rule 702 may nonetheless be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also*

*Daubert*, 509 U.S. at 595. Thus, expert testimony that is relevant and that passes muster from a scientific standpoint may nonetheless be excluded if it is likely to be misinterpreted or misused by the jury.

## III. Analysis

### A. Defendant's Motion to Exclude Testimony of Mr. Barry

Christopher D. Barry, P.E., is plaintiff's liability expert. He has provided two reports in this case: an initial report and a rebuttal report. Defendant has moved to exclude Barry's testimony on the grounds that he failed to perform certain tests; that the tests he did perform were unreliable; that there is no basis for his opinions about alternative designs; and that he fails to opine on the ultimate cause of plaintiff's injuries. In the alternative, defendant requests an opportunity to depose Barry prior to trial.

In his rebuttal report, Barry opined that "[i]f Mr. Botelho placed his fishing boot on top of a skate fish which was lying on the work deck of the F/V Ambition, and if he immediately thereafter slipped and fell to the deck, then in my opinion an effective non-skid coating applied to the work deck of the *F/V Ambition* would have generated adequate friction between the work deck and a skate fish so as to prevent Mr. Botelho's slip and fall." (Def. Mot. to Exclude Barry Ex. B at 4). Defendant argues that this opinion is nothing more than an *ipse dixit* statement, because Barry failed to perform "1) any testing of a skate fish; 2) any testing of a skate fish's interaction with the deck of the Vessel; 3) any testing of the Plaintiff's rubber soled boot or its makeup; 4) any testing of the Plaintiff's rubber sole boot with the deck of the Vessel; and, 5) any testing of a skate fish's interaction with the Plaintiff's rubber soled boot." (Def. Mot. to Exclude Barry at 7-8). Defendant further argues that Barry never examined a skate fish and relied on an anecdote that fisherman routinely use skates to remove large rocks from the deck by placing the rock on the skate and then sliding the rock and skate along the deck and overboard.

5

Plaintiff's expert is not required to perform any particular tests in order to arrive at his opinion. Rather, the question is whether the methods he used are reliable. Here, Barry explained in detail the principles of friction that, in his experience, he asserts apply when surface interfaces are stacked. (Def. Mot. to Exclude Barry Ex. B at 4-7). After two-and-a-half pages of explanation, he applied those principles to the putative boot-fish/fish-deck surfaces at issue here. (*Id.* Ex. B at 7-9). Although he did not test the fishing boots, he examined them and explained in detail how their tread and material are designed to interact with surfaces. (*Id.* Ex. B at 8).

As to Barry's reliance on the fact that fishermen sometimes use skates to remove large rocks from the deck, he is entitled to rely on that to the extent it would be "reasonably relied upon" by experts in the field, even if it is otherwise inadmissible at trial. Fed. R. Evid. 703. But the Court need not reach that question, because plaintiff has offered to prove that fact at trial. (*e.g.*, Pl. Opp. Barry Ex. C ¶ 17). The tests that defendant suggests Barry should perform would be another possible way for him to reach a conclusion on how plaintiff's boot and the skate would interact relative to the skate and the deck. But the conclusions he did reach are more than an *ipse dixit* statement, and the methods appear reliable enough to survive *Daubert*. Defendant is of course free to question Barry as to why he did not perform the particular tests it suggests.

Next, defendant attacks the friction tests Barry performed on the surface of the vessel's work deck, contending that he did not test the area where plaintiff slipped; that there was ice over the spots he tested; and that his results were plainly inconsistent, as the measured friction coefficients decreased over time between spots 1 and 5, even though they were all the same surface.

Several of defendant's arguments appear to be simply incorrect. First, although Barry does not say that he specifically relied on testimony as to where precisely plaintiff was when he

6

fell, the five spots he tested are in the general vicinity of where plaintiff was, as established by the testimony of plaintiff and witness Chidsey. (Def. Mot. to Exclude Barry Ex. C at 150:10-153:12 (Botelho stating that he was about five feet from the portside door and three feet from the rail); Pl. Opp. Barry Ex. A at 3, 10 (showing spot 5—the most central spot tested—was a bit more than 44 inches from the portside door and a bit less than 47 inches from the rail); *id.* Ex. D at ¶ 6 (Chidsey stating that Botelho was between the door to the cutting boxes and the pile about one foot behind the edge of the deck tiles)). Second, Barry explained that prior to testing, "[t]he deck area to be measured was cleaned with a brush, sluiced off with seawater (to remove any ice particles) and sluiced off again with distilled water between each set of readings," and so there was no ice covering the test spots at the time they were tested. (Def. Opp. Barry Ex. A at 12). Third, the values did not monotonically decrease over time as defendant contends, but in fact went up and down. (*Id.* Ex. A at 13-20). And the steel surfaces at each location were not the same, contrary to defendant's assertion, but exhibited variable levels of corrosion and pitting, as he described and documented. (*Id.*).

To the extent that defendant believes that the testing conditions were different from the time of the fall in a way that might have affected the results, it is free to cross-examine Barry or offer its own expert testimony to that effect. But it offers nothing more than attorney argument in support of its position that colder temperatures would render the results unreliable. Such questions go to the weight, and not admissibility, of the opinions.

Defendant goes on to challenge the basis of Barry's opinion that the addition of different kinds of non-skid deck coatings would have met a reasonable standard of safety. Barry described several types of commercially available coatings and opined as to their effectiveness, durability, and cost. (Def. Mot. to Exclude Barry Ex. A at 22). As a professed expert in naval

7

architecture and marine engineering, those kinds of opinions appear to be well within his expertise. Included in the data and information on which he relied are several decking-product specification sheets, a journal article on coatings, and a U.S. Coast Guard coatings manual. (*Id.* Ex. A at 2). Those types of materials appear to be reliable sources. Defendant is free to present countervailing evidence that such alternatives would not be feasible for use under a scallop dredge, but the opinions are admissible and will not be excluded.

Defendant's final argument is that Barry's reports are inadequate because he fails to opine as to the ultimate issue: that is, whether defendant's failure to provide a non-skid surface caused plaintiff's injuries. But an expert report may be helpful to a trier of fact even though it does not opine on the ultimate issue. Barry's trial testimony will of course be limited to the opinions disclosed in his expert report, but it appears that those opinions would be helpful to the jury in determining whether any negligence on the part of defendant was the cause of plaintiff's injuries.

In the alternative, defendant requests an opportunity to depose Barry prior to trial. Plaintiff offered defendant this opportunity, after serving Barry's rebuttal report, and defendant affirmatively chose not to take it. Defendant has not shown good cause as to why it should be allowed to reopen discovery now. Defendant's motion to exclude the testimony of Mr. Barry and to take his deposition will therefore be denied.

### B. Defendant's Motion to Exclude Testimony of Dr. Burke

William H. Burke, Ph.D., is plaintiff's life-care expert. Defendant contends that his testimony should be excluded because Dr. Burke did not rely on an identifiable methodology, gave opinions that should be given by medical doctors, and might confuse the jury into believing that certain care has actually been prescribed to plaintiff.

Although defendant is correct that Dr. Burke is not a Certified Life Care Planner, he

nevertheless appears to be qualified to render an opinion as to plaintiff's future-care needs. He has a Ph.D. in rehabilitation services; he has opened brain injury rehabilitation centers in Arkansas, Florida, and New Hampshire; and he established the Florida Institute for Neurological Rehabilitation. (Pl. Opp. Burke Exs. B at 1, C at 24:2-21). He testified that at points in his career he was caring for 500 brain-injured patients a year. (*Id.* Ex. C at 50:17-20). In 1995, he established an international disability-management practice providing comprehensive case analysis, rehabilitation planning, life-care planning, vocational evaluation and assessment of post-injury employability, and case management services to medical, legal, and insurance companies. (*Id.* Ex. B at 2, Ex. C at 24:23-25:1). Thus, he represents that he has been studying rehabilitative care specifically for patients with brain injuries for more than thirty years, and has been in the business of providing life-care plans for more than twenty years.

Defendant argues that Dr. Burke does not identify his methodology. However, in his deposition, he testified as follows:

> A: Well, there's a methodology. There's a published methodology. It was originally established back in 1973. It's been tweaked over the years. It's now a consistent methodology that I follow, that everybody should follow. And typically the people that do this are—I mean, I'm board certified in rehabilitation as a rehabilitation counselor. The other people that do it are rehab nurses, and some psychologists.
>
> Q: What is the methodology you follow?
>
> A: Review the medical records, look at prior medical history, evaluate the patient, talk to any treating clinicians, if you can. I do it for the defense. I'm not authorized to but—and then using the literature and the research and your experience, you formulate opinions and you review those with the treating docs and the clinicians, and then you cost it out.

(Def. Mot. to Exclude Burke Ex. B at 16:21-17:13). This appears to be a sufficiently reasonable and reliable method for formulating a life-care plan. *See Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 171 (1st Cir. 2005) (holding that a district court did not abuse its discretion

in admitting testimony from a life-care expert which was "based on a review of records from the agency providing her with skilled nursing care, a letter from her physician, and an interview of Fabiola's family and caregiver"). Both Dr. Burke's deposition testimony and his expert report mention a published standard from 1973. (Pl. Opp. Burke Ex. A at 3 ("The Rehabilitation and Life Care Plan is a reliable, valid and consistent methodology that has been utilized by case managers and rehabilitation professionals for decades dating back to the Federal Rehabilitation Act of 1973. The principles and methodology of rehabilitation and life care planning have been widely published in the peer-reviewed literature and in numerous textbooks over the last thirty years."); Ex. C at 16:21-22). More importantly, Dr. Burke described how he executed that methodology in detail at his deposition, giving defendant more than enough information to allow it to challenge his method. (*See generally* Pl. Opp. Burke Ex. C).[1]

Defendant further argues that Dr. Burke provided no documentation as to where he

---

[1] Specifically, Burke testified that he discussed the plan with plaintiff's primary-care physician, treating physiatrist, and physical therapist and explained how he used their comments. (Pl. Opp. Burke Ex. C at 8:19-23, 9:18-11:2, 49:1-12, 83:2-85:1). He took notes during those conversations that were produced to defendant. (*Id.* Ex. C at 13:5-7). He testified that he reviewed plaintiff's medical records, and the list of records he reviewed was also disclosed to defendant. (*Id.* Ex. C at 9:10-16, 30:11-18, 37:16-20). He testified that he interviewed plaintiff himself and his wife, he described what they told him, and defendant had access to his notes from the interview. (*Id.* Ex. C at 12:1-9, 31:17-32:10, 33:3-36:13, 45:13-47:7, 59:7-15, 62:19-63:11, 85:9-102:10). He testified that his findings as to the "current status" of plaintiff's recovery were based on his interview with plaintiff and the medical records. (*Id.* Ex. C at 39:16-40:11). He explained the findings he made as to plaintiff's symptoms and why he classified each as objective or subjective, and testified that he relied on Dr. McGrath's report for cognitive ability and capacity to return to work. (*Id.* Ex. C at 43:19-45:1, 46:19-22, 47:10-48:5, 61:11-15). He testified that his opinions as to the medical intervention plaintiff would need over time were based on his conversations with plaintiff's doctors. (*Id.* at 66:15-67:4). He explained that he sourced medical costs from facilities in the area. (*Id.* Ex. C at 18:7-19:19, 66:15-67:17, 107:16-108:6). He explained how he used the American Time Survey to value the work plaintiff's wife is currently doing for free. (*Id.* Ex. C at 53:1-55:16). He detailed what kinds of support services plaintiff would need, what tasks those people would be doing, what education they would need, how many hours a week they would work, and how much they would charge. (*Id.* Ex. C at 68:7-80:20). That series of steps is sufficient to constitute a "methodology" for these purposes, and provides defendant sufficient information to assess its reliability.

Also, the methodology defendant alleges that a life-care expert should use is hardly more detailed than that espoused by Dr. Burke—"The life care planner uses a consistent valid, and reliable approach to research, data collection, analysis, and planning" in that he "researches appropriate options and charges for recommendations, using sources that are reasonably available to the evaluee," "uses a consistent method to determine available choices and charges," and "uses and relies upon relevant research that should be readily available for review reflected within the plan." (Def. Mot. to Exclude Burke at 4).

obtained the cost data on which he relied. However, plaintiff has pointed to evidence that those costs were in fact documented, and that they came from the doctors and billing office of plaintiff's treating providers or facilities in his area. (*See* Pl. Opp. Burke Ex. C at 18:7-19:19, 66:15-67:17, 107:16-108:6; *id.* Ex. E). Those appear to be sufficiently reliable sources for the purposes of the *Daubert* inquiry.

Defendant contends that the kind of care Dr. Burke says that plaintiff requires should be prescribed by a medical doctor, which Dr. Burke is not. Defendant particularly complains about certain line items on Dr. Burke's future-care plan, including the need for a "case manager/community living coordinator," a "community living coach/day activity coordinator," and a "household production assistance/transportation" if his wife stays with him and continues to provide care; or a "case manager/community living coordinator," a "live-in PCA/homemaker," "board for live-in," "live-in health insurance," a "day activity program" and a "household production assistance" if his wife does not. (Def. Mot. to Exclude Burke at 7). Defendant has not provided any reason why those kinds of care would have to be prescribed by a medical doctor, and they seem to be within the scope of a life-care plan. Indeed, Dr. Burke testified that a medical doctor would manage plaintiff's medical care, but not his day-to-day care. (Pl. Opp. Burke Ex. C at 20:5-21:2, 36:21-37:7). Defendant argues that Dr. Burke's assessment of plaintiff's needs are speculative and unsupported. Under the circumstances, that is a proper ground for cross-examination, but not a reason to exclude the testimony.

Defendant's motion to exclude the testimony of Dr. Burke will therefore be denied.

### C. Defendant's Motion to Exclude Testimony of Dr. McGrath

Defendant has also moved to exclude the opinion of Neal McGrath, Ph.D., who is plaintiff's expert on neuropsychological issues. Defendant contends that Dr. McGrath has not been qualified as an expert; that he did not identify a reliable methodology for coming to his

conclusions; that he purports to make a medical diagnosis, although he is not a doctor; and that he came to his conclusion without reviewing any of plaintiff's medical records.

Plaintiff responds that because Dr. McGrath is his treating neuropsychologist, he was not required to provide an expert report, and plaintiff's only disclosure obligation was to provide "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C); *see id.* 26(a)(2)(B) (requiring a report where "the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony"). Plaintiff provided those disclosures. (Pl. Opp. McGrath Ex. 5 at 15-18).

It appears that Walter Panis, M.D., plaintiff's treating neurologist, referred plaintiff to Dr. McGrath for a neuropsychological evaluation. (Def. Mot. to Exclude McGrath Ex. A at 1). That visit was approved by defendant's insurer pursuant to defendant's cure obligation, which tends to show that the evaluation was made for medical and not legal purposes. (Pl. Opp. McGrath Exs. 1, 2). Plaintiff's Rule 26(a)(2)(C) disclosure, served on January 23, 2017, identified Dr. McGrath as a "neuropsychologist licensed in Massachusetts who specializes in sports concussions [who] is a treating physician of the Plaintiff." (Pl. Opp. McGrath Ex. 5 at 16; *see also id.* Ex. 7 at 3, 8).

The report at issue is not an expert report, but a medical record. Under the heading "Reason for Referral," it states that plaintiff "has not been able to return to work due to brain injury-related problems and he is now referred for his first lifetime neuropsychological evaluation by his neurologist/physiatrist Walter Panis M.D. to assist in determining his status in recovery." (Def. Mot. to Exclude McGrath Ex. A at 1). It describes a variety of testing done by

12

Dr. McGrath, and the results of those tests. (*Id.* Ex. A at 3-7). And it makes recommendations concerning plaintiff's capabilities and future treatment based on the results of the tests that Dr. McGrath himself administered. (*Id.* Ex. A at 7-8).

Defendant is correct that the expert testimony by treating physicians and other health-care professionals must still meet the *Daubert* standard. *See Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009). But plaintiff did not have a pretrial burden to identify Dr. McGrath's methodology. For defendant to challenge that testimony before trial as unreliable, it must show why the testimony should be excluded. In any event, it appears that the testimony Dr. McGrath intends to give meets the *Daubert* standard. Plaintiff has disclosed that Dr. McGrath will testify as to his recovery status, the results of his neuropsychological testing, the cause of his injuries, the permanency of those injuries, his limitations, and his future needs. (Pl. Opp. McGrath Ex. 5 at 16-18). As a neuropsychologist, he appears to be qualified to give such opinions; a person may have expertise relevant to a patient's health without being a medical doctor. The basis for those opinions is Dr. McGrath's own examination of plaintiff, along with his specialized knowledge in the field of neuropsychology. Although, as explained above, plaintiff was not required to produce and expert report detailing Dr. McGrath's methods, his report listed twelve standard neuropsychological tests by name, which he presumably administered in a standard way. (Def. Mot. to Exclude McGrath Ex. A at 4). To the extent defendants disagree with his conclusions, they are free to cross-examine him.

Defendant also argues that Dr. McGrath's opinion should be excluded under Rule 403 because there is a danger that the testimony could mislead the jury into thinking that plaintiff has actually been prescribed future care by Dr. McGrath. Any such confusion could be cured by cross-examination or, if necessary, by an appropriate instruction. The Court will therefore not

exclude the evidence on that ground.

Finally, defendant requests that if its motion to exclude the testimony is denied, it should be allowed to depose Dr. McGrath in advance of trial. Defendant had an opportunity to depose Dr. McGrath while fact discovery was open and declined to do so. Defendant has not even attempted to show good cause as to why it did not depose Dr. McGrath earlier, and the Court will not allow it now.

Plaintiffs' motion to exclude Dr. McGrath's testimony will therefore be denied.

### D. Plaintiff's Motion to Exclude Part of Dr. Bellemare's Opinion

Plaintiff has moved to exclude a particular portion of the opinion of Simon Bellemare, Ph.D., defendant's expert on materials engineering. Specifically, plaintiff seeks to exclude the conclusion that "the addition of a non-skid coating on the surface of the deck would have had no effect if Mr. Botelho did indeed slip on a skate fish." (Pl. Mot. to Exclude Bellemare Ex. A at 1).

Plaintiff contends that Dr. Bellemare's report is completely devoid of any information about the facts on which that opinion is based or the methodology used to arrive at that conclusion. In response, defendant does not point out where in the report those facts and reasons can be found (and indeed, the Court cannot discern any). Rather, defendant argues that it does not have to provide a basis for Dr. Bellemare's opinion because he was only hired as a rebuttal expert to review Mr. Barry's report.

While Dr. Bellemare is free to testify about the flaws in Mr. Barry's methods and conclusions, he is not free to express an opinion as to how a non-skid coating on the surface of the deck would have functioned if plaintiff slipped on a skate fish without disclosing the factual

14

and methodological basis of that opinion.[2] Because the report does not contain that information, plaintiff's motion to prohibit Dr. Bellemare from testifying that the non-skid coating would have made no difference if plaintiff slipped on a skate will be granted.

### E. Plaintiff's Motion to Exclude Expert Opinions Related to the IFISH Conference

Finally, plaintiff has moved to exclude the opinions in Captain Richard DiNapoli's report that appear under the heading "Findings of the IFISH Conference." That part of the report discusses a presentation at a conference titled "An Experimental Comparison of Marine Vessel Deck Materials and Footwear Slip Resistance Under Varying Environmental Conditions," given by Brad Wallace. Capt. DiNapoli relies on the paper to conclude that "the standard for a safe level of friction is generally recognized to be a coefficient of friction of 0.50 or higher," and that "fishing boots such as Plaintiff was wearing at the time of his fall typically do not slip, even on wet bare steel deck surfaces." (Pl. Mot. to Exclude IFISH Ex. A at 12). He later opines that the coefficient of friction plaintiff's expert measured on the deck "exceeded the standard for a safe level of friction as verified by the IFISH Conference proceedings." (*Id.*).

"IFISH" stands for International Fishing Industry Safety and Health; the IFISH conference was a conference sponsored by the National Institute for Occupational Safety and Health ("NIOSH") in Alaska in 2003. Wallace gave a presentation at the conference, and his

---

[2] The Court notes that in the "Conclusions" section of his report, Dr. Bellemare does not appear to opine whether a non-stick coating would have made any difference; rather, he seems to opine that Dr. Barry had no basis for concluding otherwise:

> The proposition to add a non-skid coating to the work surface of the deck is not supported by an analysis that includes potential additional risk from its premature deterioration and the associated increased difficulty to maintain the work area clean. Also, there is no basis by Mr. Barry that a non-skid on the work surface of the deck would have had no effect if Mr. Botelho, as witnessed by Mr. Chidsey and described by Mr. Botelho in his initial statement, indeed slipped on a skate fish which was on the deck.

(Pl. Mot. to Exclude Bellemare Ex. A at 4).

15

paper was published in a subsequent "Proceedings" document that collected papers from presenters at the conference. Those papers appear to have been reviewed by a NIOSH senior scientist, but were not subject to the traditional peer-review process—that is, a process where a committee of neutral scientists working in the field are given the opportunity to critique the methods of the paper before it is published. (Def. Opp. IFISH Ex. A (thanking a senior scientist in the "acknowledgments" of the Proceedings)).

> In the introduction of the paper, Wallace writes:
>
> In land-based industrial settings, slip resistance of floor surfaces may be generally measured through the use of tribometers or horizontal pull dynamometers to calculate a coefficient of friction and apply it toward a standard. Based on consensus standards, proposed regulations, and case law (English 2000), the standard for a safe level of friction is generally recognized to be a coefficient of friction of 0.50 or higher. It should be noted that this is for level surfaces. The Americans with Disabilities Act recommends wheelchair access ramps have a minimal static coefficient of friction of 0.80 or higher (English 2000).

(Pl. Mot. to Exclude IFISH Ex. B at 67). He then proceeds to use a "novel testing device" meant to simulate a person walking to test different boot-surface interactions under various conditions. (*Id.* at 67). According to the methods of the paper, the walking simulation was "repeated until a slip occurred four times. The test device was then rotated 90°, and the test sequence was repeated until a slip condition occurred four more times in the perpendicular direction." (*Id.* at 71). Although the paper lists four types of deck coating, three types of shoes, and three environmental conditions (dry, wet, oiled), the results are presented haphazardly without identifying the result from each particular combination. (*Id.* at 69-70). With respect to dry surface-boot combinations, "all test combinations failed to produce a slip," and the paper acknowledged that "[t]he test data do not suggest that the combinations will not cause a slip, only that the test device limits were reached prior to reaching a slip condition." (*Id.* at 71). With respect to wet surfaces, all the paper says is "[a]ll surface-boot combinations but two failed to

16

slip up to the limits of the test device. Not surprisingly, both slips occured [sic] on plain painted steel. Data for the wet tests also show that when a deck surface was treated with one of the slip-resistant coatings, results rose significantly." (*Id.* at 71). That is the statement Capt. DiNapoli relies on when he opines that "[t]he two referenced slips were presumed to occur with the conventional steel-toe work boots that were tested and these tests demonstrated that fishing boots such as Plaintiff was wearing at the time of his fall typically do not slip, even on wet bare steel deck surfaces." (*Id.* Ex. A at 12).

Plaintiff contends that the paper is not reliable, and therefore Capt. DiNapoli's opinions concerning it should be excluded. He argues that it was not peer-reviewed, that it is not the "Findings of the IFISH Conference" as described, that the testing device is not established, and that the "English 2000" paper from which Wallace obtains his standard for a safe level of friction does not in fact report any such thing. Plaintiff further contends that Capt. DiNapoli misread the paper by opining that 0.50 was the appropriate standard for marine settings, because Wallace explicitly states that that is the standard for "land-based industrial settings."

With some misgivings, the Court concludes that the flaws in the Wallace paper are not so egregious as to render any reference to it inadmissible. First, it is Capt. DiNapoli, and not Wallace, who is the expert in this case. The methods of Wallace are thus only indirectly at issue—the question is whether a reasonable expert in marine operations would rely on Wallace's presentation. The Court is reluctant to categorically say that he would not. Plaintiff is of course free to cross-examine Capt. DiNapoli on the basis of his opinions on cross-examination.

However, defendant is not permitted to mischaracterize the Wallace paper. First, defendant may not refer to it as a "finding of the IFISH Conference." NIOSH explicitly disclaimed any endorsement of the opinions and conclusions expressed in the proceedings. (Pl.

17

Mot. to Exclude IFISH Ex. C). It would be unfairly prejudicial to allow defendant or its expert to suggest that Wallace's paper enjoyed the imprimatur of a government agency or scientific body. Second, defendant may not represent that Wallace's statement of the "standard for a safe level or friction" refers to marine settings. It is clear from the paragraph that the paper only purports to name a standard for "land-based industrial settings."

Plaintiff's motion to exclude the "findings of the IFISH Conference" will therefore be granted in part and denied in part.

## IV. Conclusion

For the foregoing reasons,

1. Defendant's motion to exclude the testimony of Mr. Barry is DENIED;
2. Defendant's motion to exclude the testimony of Dr. Burke is DENIED;
3. Defendant's motion to exclude the testimony of Dr. McGrath is DENIED;
4. Plaintiff's motion to exclude Dr. Bellemare's third opinion, concerning the effect of the addition of a non-skid coating, is GRANTED; and
5. Plaintiff's motion to exclude reference to the findings of the IFISH conference is GRANTED in part and DENIED in part.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor, IV
Dated: May 18, 2018                United States District Judge